**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| **GARDA SUPPLIES, RENTAL &** **SERVICES, LTD.,** | |
| **Plaintiff,** | |
| **v.** | |
| **CITY WALK ONE, LLC,** | **Civil Action No.: 2:17cv583-MSD-lRL** |
| **Defendant,** | |
| **v.** | |
| **GARDA WORLD SECURITY** **SERVICES CORPORATION,** | |
| **Third-Party Defendant.** | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 37**

Defendant, City Walk One, LLC ("City Walk"), by counsel, and pursuant to Fed. R. Civ. P. 37(a)(3)(C), (a)(4), (b), and (c), submits this memorandum in support of its Motion for Sanctions based upon the (1) misrepresentations by Plaintiff , Garda Supplies, Rental & Services, LTD's ("Garda" or "Plaintiff") allegedly key witness, Justin Uditsky, during his deposition; (2) Mr. Uditsky's evasiveness and refusal to provide complete disclosure of pertinent facts that hurt Garda's case; and (3) Garda's misrepresentations in its discovery responses. As described herein, Garda's discovery violations are severe and relevant to the foundational issue in this case: whether Garda was "constructively evicted" from the Leased Premises or whether, in truth, Garda had planned to relocate from the Leased Premises as part of a larger business plan and then fabricated a constructive eviction claim to absolve them of their rent payments under the Sublease.

Fed. R. Civ. P. 26 allows parties to obtain discovery "regarding any non-privileged matter that is relevant to any party's claim or defense," provided the burden of acquiring the information does not outweigh the benefit.  In turn, Fed. R. Civ. P. 37(a) allows a party to "move for an order compelling disclosure or discovery," including discovery related to a deposition under Rule 37(a)(3)(C).  Under Fed. R. Civ. P. 37(a)(4), an evasive or incomplete disclosure is equivalent to non-disclosure.  *See Kolon Indus. v. E.I. du Pont de Nemours & Co.*, No. 3:11cv622, 2012 U.S. Dist. LEXIS 22475, at *3-4 (E.D. Va. Feb. 22, 2012).

Garda has repeatedly attempted to conceal material witnesses and documents from City Walk, which are devastating to Garda's case.  Supplemental documents produced by Garda (and attached to this motion) prove that Garda planned to relocate from the Leased Premises by at least March 12, 2017 and was notifying clients of such plan as early as May 17, 2017 – <u>months before any alleged "constructive eviction" issues arose</u>.  Garda refused to identify key witnesses, intentionally withheld vitally important documents, and made demonstrably false statements both to the Court in its filings and to City Walk in discovery responses.  Given these severe discovery violations, City Walk seeks significant but proportionally appropriate remedies from the Court: (1) the striking and/or dismissal with prejudice of Garda's First Amended Complaint (the "Complaint") in its entirety; (2) exclusion of Justin Uditsky as a witness on behalf of Plaintiff in this case; and (3) an award of attorneys' fees and costs in filing and defending this motion.

## INTRODUCTION

Throughout the discovery process, Garda repeatedly attempted to conceal material witnesses and documents because they are necessarily harmful to its claim that it was constructively evicted from the Building.  In its Complaint, Garda alleges that on November 10,

2017, "extensive flooding" in the Leased Premises, along with other generally referred to "violations and inferences" "forced Garda to cease its business operations," "substantially interfered with Garda's right to quiet use and enjoyment of the Leased Premises," and "forced Garda to vacate the Leased Premises." (Compl. ¶ 35-40.)   However, as discussed below, the decision to vacate the Leased Premises was made sometime prior to March 12, 2017, as part of a strategic optimization plan designed to improve Garda's operational efficiency.  To conceal this fact and to support its claims, Garda attempted to unilaterally and drastically narrow the scope of discovery by failing to identify key witnesses, withholding central documents, and making demonstrably false statements to the Court and to City Walk.

Garda's repeated claim that it was forced out of the Leased Premises in November 2017 due to construction within the Building is demonstrably false.  Garda has acted in bad faith throughout the discovery process to conceal key witnesses and documents, provided false and evasive responses to discovery requests, and made false statements in court filings.  Sanctions are warranted under Rule 37, including the dismissal of the Complaint with prejudice and the exclusion of Justin Uditsky as a witness for Garda at trial.

I.      **Summary of Garda's Misrepresentations**

1. **Garda concealed facts regarding its national consolidation plan, "Project Whiskey."**
   - Garda did not produce a single document referencing Project Whiskey until January 10, 2019 (following Court Order on City Walk's Motion to Compel), just two weeks before the close of discovery, and *still* fails to disclose existence of Project Whiskey or the Hampton consolidation in any interrogatory response. Instead, Garda repeated its prior, directly-refuted statements that Garda never had a formal plan to move from Norfolk.

   - Garda's failure to disclose the existence of Project Whiskey and that the Hampton consolidation was part of Project Whiskey has severely prejudiced City Walk's ability to discover the facts of this case regarding the timing and reasoning behind Garda's decision to consolidate to Hampton.

2. **Garda refused to identify key witnesses to improperly limit the scope of discovery, including high-level employees involved in the decision to consolidate to Hampton, Trent Bonnell (former Chief Operating Officer) and Steve Morss (former Vice President, Transformation Management).**

   - Garda only identified Justin Uditsky (Director, Real Estate) and Eileen Weatherbee (Branch Manager, Norfolk) in its Fed. R. Civ. P. 26 Initial Disclosures and subsequent Interrogatory Responses.

   - On January 10, 2019, (after entry of the Court's Order) Garda identified additional individuals with knowledge, but ***still*** **did not identify Steve Morss, Vice President of Transformation Management**, despite producing documents evidencing his central involvement in the Norfolk relocation to Hampton, Virginia.

3. **Justin Uditsky (Director, Real Estate) was evasive and made statements that were not credible in deposition testimony.[1]**

   - <u>Mr. Uditsky said "I don't recall" ~140 times during his deposition, including that he could not recall talking to anyone in Garda's operations department prior to August 15, 2017 regarding the Norfolk move to Hampton, despite numerous written communications with others at Garda including the Chief Operating Officer regarding the Norfolk move between March and August 2017:</u>

     Q. And before August 15th did you have any discussions with any executive about the Norfolk to Hampton move?

     A. I don't recall.

     Q. Did – before August 15th, 2017 did you have any discussions with anyone in the eastern region about the Norfolk to Hampton move?

     A. I most likely had a conversation with Eileen Weatherbee about it.

     Q. How about someone at the eastern region, not an on-site Garda employee but someone at Garda like Joe or someone else?

     A. I don't recall. It's possible, but I don't recall.

     Q. Who made the decision before August 15th, 2017 that Norfolk was going to move to Hampton?

     A. I made the decision.

     Q. Without any consultation with operations?

---

[1] The full transcript of Mr. Uditsky's December 6, 2018 deposition is attached as **Exhibit 1**.

A. Without any consultation with operations.

Q. And so you must have before August 15th, 2017 talked to someone in operations about that decision.

A. I don't recall.
…

Q. So you don't remember whether you talked to anyone else, other than Eileen, before August 15th, 2017 about the move?

A. I don't recall.
…

Q. Do you remember ever sending any E-mails about the decision that you made -- you said you made the decision -- the decision you made to move from Norfolk to Hampton?

A. I don't recall an E-mail, no.

See **Ex. 1** (Uditsky Dep. at 176-83)

- Mr. Uditsky stated that the Norfolk move was not part of a consolidation plan referred to as "Project Sunset," and failed to disclose that it was actually part of a plan called "Project Whiskey":

    A. There was a mandate based on a project where a certain number of locations were closing upon lease expiring and we were consolidating those number of locations into another number, and I had to go and find the replacement locations.
    …..

    Q. What was the name of that project?

    A. I believe we entitled – I'm sorry. I believe it was entitled Project Sunset.
    ….

    Q. Were any of the Virginia Garda locations at all affected by Project Sunset?

    A. No.

*Id.* at 56-58.

- <u>Mr. Uditsky stated that the decision to move was made solely by him between August 1-10, 2017, despite numerous documents showing that the decision was actually made in March 2017 and showing that Justin actively communicated with others at Garda prior to August 1, 2017:</u>

> Q. And as of June 2nd Garda was going to leave the premises during 2017; isn't that a fair statement?
>
> A. No, it is not.
>
> Q. And the decision as of June 2nd had been made that the Norfolk operations were going to move to Hampton as of June 2nd?
>
> A. No, it was not.
>
> Q. You would agree with me that that decision to move from Norfolk to Hampton was made by the July, August time period?
>
> A. I would say that that decision was made to move probably in and around the August to September time frame.
>
> ….
>
> Q. So you would agree with me that as of August 15th, 2017 that Garda had made the decision that Norfolk was moving to Hampton?
>
> A. Yes.
>
> Q. This E-mail is August 15th, so that decision had to have been made sometime prior to August 15th, correct?
>
> A. Relatively close to.
>
> Q. But sometime prior, right?
>
> A. Relatively close to.
>
> Q. When you're saying relatively close to, would that – a decision like that, when you assign a project manager, wouldn't that take at least a couple weeks to implement?
>
> A. Again, my recollection is that sometime as of August, between August and September we made it.
> …

Q. So from reading this E-mail, when you're the project manager – so you agree with me – we'll break it down. Sometime before August 15th, 2017 Garda had decided the Norfolk operations were moving to Hampton?

A. Yeah, and I am saying that it would be sometime within -- again, as I stated before, August.

Q. Okay. And we know it was before August 15th based on this E-mail, correct?

A. Yeah.
…

Q. Who made the decision before August 15th, 2017 that Norfolk was going to move to Hampton?

A. I made the decision.

Q. Without any consultation with operations?

A. Without any consultation with operations.

Q. And so you must have before August 15th, 2017 talked to someone in operations about that decision.

A. I don't recall.
…

Q. I'm asking you when you made the decision.

A. I mentioned before --

MR. BRANIGAN: Objection.

THE WITNESS: -- sometime in August.

BY MR. LYNCH: Q. You **don't** think there was any chance it was in June or July?

A. I know it wasn't.

MR. BRANIGAN: Objection to form, repetitious.

BY MR. LYNCH: Q. What day in August did you make the decision?
19 A. I don't recall.

Q. So – but you would agree with me it had to be between August 1st and August 15th, right?

A. Yes, I would agree.

Ex. 1 at 176-83.

**4. Garda repeatedly represented that it never had a plan to consolidate Garda's business operations to Hampton, despite volumes of documents directly contradicting that position.**

o   November 1, 2018 Responses to City Walk's First Discovery Requests:[2]

▪ *Answer to Interrogatory No. 7* – "[T]he relocation of its business operations away from Norfolk was not in accordance with any plan to consolidate Garda's business operations."

▪ *Answer to Interrogatory No. 8* – Garda "never had a 'plan to consolidate business operations away from Norfolk,' or intended to leave the Leased Premises."

▪ *Answer to Request for Document No. 17*: In response to a request for "all Documents relating to any national consolidation plan or other business plan to consolidate Garda's real estate footprint," Garda stated that it had no responsive documents in its possession.

o   January 10, 2019 Supplemental Responses to City Walk's First Discovery Requests (after entry of the Court's Order on City Walk's Motion to Compel):[3]

▪ *Supp. Answer to Interrogatory No. 7* – "There was no formal or finalized plan to move the business operations from Norfolk before the constructive eviction[.]"

## II.      Timeline of Garda's Discovery Malfeasance

● **September 20, 2018** – City Walk served its First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions to Garda.

● **October 23, 2018** – Garda produced its Fed. R. Civ. P. 26 Initial Disclosures, attached hereto as **Exhibit 4**.

---

[2] Garda's November 1, 2018 Responses to City Walk's First Discovery Requests are attached as **Exhibit 2**.

[3] Garda's January 10, 2019 Supplemental Responses to City Walk's First Discovery Requests are attached as **Exhibit 3**.

- o   The disclosures included a document production of redundant email correspondence between City Walk and Garda.  No internal emails or documents reflecting Garda's initial decision to relocate from Norfolk were included.

- o   The required disclosures ***only identify*** Justin Uditsky (Director, Real Estate) and Eileen Weatherbee (Branch Manager, Norfolk) as individuals with relevant knowledge of this case.

- **November 1, 2018** – Garda serves inaccurate responses to City Walk's discovery requests.

  - o   <u>Answer to Interrogatory No. 7</u> – "[T]he relocation of its business operations away from Norfolk ***was not in accordance with any plan to consolidate Garda's business operations***."

  - o   <u>Answer to Interrogatory No. 8</u> – Garda "***never had a 'plan to consolidate business operations away from Norfolk,' or intended to leave the Leased Premises***."

  - o   <u>Answer to Request for Document No. 17</u>: In response to a request for "all Documents relating to any national consolidation plan or other business plan to consolidate Garda's real estate footprint," Garda stated that it had ***no responsive documents in its possession***.

- **November 14 and 20, 2018** – Garda serves its first and second supplemental document productions (No supplemental discovery pleading was provided).

  - o   The production includes one email from a Garda employee to Bank of America (Garda's client) dated August 10, 2017, reflecting the then-earliest identified date that Garda decided to relocate from Norfolk to Hampton.  That email is attached hereto as **Exhibit 5** (Garda 001555-001558).

- **November 21, 2018** – City Walk files its Motion to Compel [ECF No. 54] regarding Garda's deficient discovery responses and stonewalling efforts regarding the Norfolk relocation to Hampton.

- **December 4, 2018** – Deposition of Eileen Wetherbee (Garda's Norfolk Branch Manager).

  - o   Ms. Weatherbee identified, for the first time, numerous individuals who were not disclosed by Garda in its Fed. R. Civ. P. 26 Initial Disclosures or Interrogatory Responses, including ***Nick Gentile, Project Manager of the Norfolk relocation***.

- **December 5, 2018 –** Garda filed its Opposition to City Walk's Motion to Compel.  (*See* ECF 54.)

       o  Garda represents to the Court that additional "relevant documents with third parties as well as 'internal ruminations about its planned relocation from Norfolk to Hampton'… ***do not exist***." ECF 54 at 6.

- **December 6, 2018** – Deposition of Justin Uditsky (Director of Real Estate), attached hereto as **Exhibit 1**.

  o  Mr. Uditsky is extremely evasive, making over 140 "I don't recall" statements, including when questioned about who he communicated with regarding the decision to move from Norfolk to Hampton. *See* Ex. 1 at 124-26.

  o  Uditsky stated that the decision to move to Hampton was made between August 1-10, 2017. *Id.* at 176-83.

  o  Uditsky stated that the Norfolk closure was not a part of "Project Sunset," a project where Garda was closing and consolidating a number of offices across the country. *Id.* at 56-59.

- **December 14, 2018** – The Court issued its Order Granting Hearing on Motion to Compel. (*See* ECF No. 70.)  The Court noted: "[Garda] responded that it has provided full and complete responses to Defendant's discovery requests[.]" *Id.*

- **December 20 and 21, 2018** – Garda served supplemental documents to City Walk.

  o  After representing that no additional documents existed, Garda produced over 1,000 pages of additional documents, which indicated that Garda's decision to consolidate from Norfolk into Hampton was made ***prior to May 17, 2017****,* and that the Norfolk move was part of a national strategic network optimization plan. For example:

  - <u>July 17, 2017</u> – PowerPoint presentation to Bank of America entitled "Strategic Network Optimization" and including notification of Norfolk move.  This presentation is attached hereto as **Exhibit 6** (Garda 2660-66).

  - <u>July 18, 2017</u> – Email from Uditsky to David Rosenbleeth identifying a blank "project tracker" regarding multiple branch relocations including Norfolk to Hampton.  This email is attached here to **Exhibit 7** (Garda 2743-47).

  - <u>July 24, 2017</u> – Email exchange between Rosenbleeth and Uditsky discussing the number of employees that will move from Norfolk to Hampton.  This email is attached here to **Exhibit 8** (Garda 002763).

  - <u>August 1, 2017</u> – PowerPoint presentation titled "Partnership Review" regarding presentation to Wells Fargo.  This presentation is attached hereto as **Exhibit 9** (Garda 001842-001864).  The presentation indicates that the decision to consolidate to Hampton was made prior to May 17,

2017 and references a meeting involving Uditsky and Trent Bonnell, the Chief Operating Officer of Garda.  *Id.* at GARDA 001864.

- o **Revelations from December 20, 2018 production:**

    - ▪ Uditsky's sworn testimony that the decision to move from Norfolk to Hampton was made solely by him between August 1-10, 2017 was not credible.

    - ▪ Uditsky personally communicated with others at Garda regarding plans to move from Norfolk to Hampton prior to August 1, 2017.

    - ▪ Garda's sworn interrogatory responses that it never had a plan to consolidate Garda's business operations from Norfolk to Hampton were not accurate.

    - ▪ Garda made a false representation to the Court in its Opposition to City Walk's Motion to Compel that additional relevant documents with third parties as well as "internal ruminations about its planned relocation from Norfolk to Hampton… ***do not exist.***"

- **January 3, 2019 –** Hearing on City Walk's Motion to Compel.

    - o During the hearing the Court noted that "Mr. Uditsky, in his deposition, seemed to give the impression that [the Norfolk to Hampton move] was pretty much his call, his decision, and he didn't really e-mail or write any memos about it, he just kind of decided to do it."  The transcript is attached hereto as **Exhibit 10**.

    - o Garda repeated the position taken in Uditsky's deposition that the decision to move was made in August 2017, and that the Norfolk move was not part of "Project Sunset," which was described as a national plan to consolidate certain Garda locations:

        - ▪ "Mr. Uditsky said, under oath multiple times, he made the decision, the ultimate decision to move, and he made that decision no later than August of 2017.  And he made that decision for one reason and one reason alone.  He made that decision because the folks operating in the Norfolk operation could not continue to operate under the circumstances that they were being subjected to by the daily interruptions, or near daily interruptions, caused by the construction."  *See Id* at 46.

        - ▪ "Mr. Uditsky was questioned extensively about Project Sunset in his deposition and said, under oath, that the Norfolk operation and the Hampton operation and other operations on the East Coast were not part of Project Sunset." *Id* at 47.

    - o The Court issued an Order granting City Walk's Motion to Compel in part [ECF

No. 83] and required Garda to provide additional supplemental discovery responses by January 10, 2019.

- **January 10, 2019 –** Garda served a supplemental document production and supplemental discovery pleadings, which are attached hereto as **Ex. 3**.

    o The production contained nearly 1,300 additional documents, including numerous internal emails and other documents regarding Garda's confirmed plan to consolidate its Norfolk location to Hampton in March 2017, and that such move was part of a series of consolidations referred to as "Project Whiskey." For example:

        ▪ <u>March 12, 2017</u> – Email from Uditsky to Trent Bonnell (former Garda Chief Operating Officer) stating that he "will commence my conversation with the LL tomorrow about getting out of Lease" and that he wanted to "Advise Karl/Joe *of the plan to move Norfolk to Hampton*[.]" A copy of the email is attached hereto as **Exhibit 11** (Garda 003667-003668).

            • This email confirms that the decision to move Norfolk to Hampton was made sometime prior to March 12, 2017, and that Uditsky communicated with the head of Garda's operations department regarding the plan to move prior to March 14, 2017, when he first contacted City Walk about a potential lease termination.

            • This email provides conclusive evidence that Uditsky was not truthful in his deposition that:

                o Uditsky made the decision to relocate to Hampton by himself;

                o Uditsky made that decision sometime in August; and

                o Uditsky could not recall communicating with anyone prior to March 14, 2017 about the move.

        ▪ <u>March 23, 2017</u> – Email exchange involving Justin Uditsky, Trent Bonnell (former COO), and Steve Morss (former Vice President of Transformation Management) discussing the "Norfolk upcoming move[ ]." A copy of the email is attached hereto as **Exhibit 12** (Garda 003665-003666).

            • This email, between high level Garda executives, reflects the first time that Steve Morss is identified as someone involved in the initial decision to consolidate to Hampton, and includes instructions from Trent Bonnell to train an individual so that he could "do Springfield & Norfolk upcoming moves."

- Garda only disclosed Trent Bonnell as an individual with knowledge relevant to this case on January 10, 2019 (following the Court's Order on City Walk's Motion to Compel) and Garda *still* has not disclosed Steve Morss.

▪ March 28, 2017 – Email exchange involving Trent Bonnell reflecting numerous planned consolidations, including Norfolk and identifying May 31, 2017 as the timing of the move to Hampton. A copy of the email is attached hereto as **Exhibit 13** (Garda 003663-003664).

- The target timing of May 31, 2017 is significant because, on June 2, 2017 (two days after the target timing), Garda began the process of leaving Norfolk by sending a letter to City Walk giving sixty (60) day notice of its intention to vacate the Leased Premises in accordance with the Sublease.

▪ April 25, 2017 – Email identifying the Hampton consolidation (from Norfolk) as part of "Project Whiskey." A copy of the email is attached hereto as **Exhibit 14** (Garda 002954).

- Uditsky testified under oath (which was repeated to the Court by Garda's counsel at the hearing on City Walk's Motion to Compel) that the Norfolk move was not part of a national consolidation plan referred to as "Project Sunset." Such statements were clearly misleading, as the Norfolk move was part of "Project Whiskey," a separate, but obviously relevant, Garda consolidation plan.

- City Walk had no way of learning about Project Whiskey or distinguishing Project Whiskey from Project Sunset except by relying on the sworn testimony of Uditsky, which was misleading.

▪ May 2017 – PowerPoint presentation entitled "Project Whiskey – Recommendations and Path Forward" identifying the Norfolk consolidation to Hampton and projecting May 31, 2017 as the target time for the move. A copy of the presentation is attached hereto as **Exhibit 15** (Garda 002954).

▪ July 28, 2017 – Email from Garda Vice President of Transformation & Strategic Initiatives enclosing a "Real Estate Roadmap." A copy of the email is attached hereto as **Exhibit 16** (Garda 003647-003651).

- The email reflects that the Hampton consolidation was "in process," the consolidation had a target date of November 17, 2017 (actual consolidation occurred on November 13, 2017), and would result in a real estate benefit to Garda in the amount of $15,000 per month.

13

o   Despite the wealth of documents proving otherwise, Garda's supplemental interrogatory response to City Walk's Interrogatory No. 7 repeated Garda's prior false representation that "[t]here was no formal or finalized plan to move the business operations from Norfolk before the constructive eviction[.]"  A copy of the interrogatory responses is attached hereto as **Exhibit 2**.

o   **Revelations from January 10, 2019 production:**

▪   The production provided further confirmation that Uditsky's deposition testimony that the decision to move to Hampton was made solely by him between August 1-10, 2017 was not credible.

▪   Uditsky had written communications with others at Garda, including executives such as Trent Bonnell, regarding plans to move from Norfolk to Hampton prior to March 14, 2017.

▪   In its supplemental interrogatory responses, Garda repeated the false claim that it never had a formalized plan to consolidate Garda's business operations to Hampton.

▪   Garda made false representations to the Court in its Opposition to City Walk's Motion to Compel that additional relevant documents with third parties as well as "internal ruminations about its planned relocation from Norfolk to Hampton… ***do not exist***.";

▪   The Hampton consolidation was part of a national consolidation plan known as "Project Whiskey," despite misleading statements from Garda that the move was not part of "Project Sunset."

▪   Garda failed (and still fails) to disclose Steve Morss, the Vice President of Transformation Management, who was centrally involved in the planning of the Norfolk move/Hampton consolidation, as an individual with pertinent knowledge of the facts of this case.

## III.   Prejudice to City Walk

As a result of Garda's repeated acts of bad faith during the discovery process, City Walk

has been severely prejudiced in the following ways:

●   Garda's failure to disclose the existence of "Project Whiskey" and that the Hampton consolidation was part of such project misled City Walk and precluded it from seeking additional discovery on Project Whiskey.  When Garda first produced Project Whiskey documents on January 10, 2019, the window for City Walk to issue discovery requests had already closed.

- Garda's failure to disclose the identity of key witnesses, including high-level employees Trent Bonnell (former COO) and Steve Morss (Vice President of Transformation Management), who had direct involvement in the decision to consolidate to Hampton, prevented City Walk from identifying the individuals involved in the decision-making process.

- Due to the diminished time it had from when Trent Bonnell was identified, City Walk was unable to locate Trent Bonnell to take his deposition. Steve Morss *still* has never been identified in any discovery response.

- Justin Uditsky's evasive deposition testimony, which was not credible, concealed key facts and contained misstatements which misled City Walk and prevented City Walk from discovering who was involved in the decision to consolidate to Hampton and when such decision was made.

- Garda's repeated misrepresentations that it never had a plan to leave Norfolk, despite documents reflecting otherwise, obscured the truth from City Walk and helped prevent City Walk from discovering when and why the initial decision to consolidate to Hampton was made, the existence of Project Whiskey, and the fact that the plan to consolidate was made many months prior to Garda's departure from the Leased Premises.

- The late disclosure of central documents on January 10, 2019 prevented City Walk from issuing any potential subpoenas for documents from third-parties within the discovery period, taking additional depositions of individuals with relevant knowledge to this case, or from having the benefit of such documents during earlier depositions.

## ARGUMENT

### I.    The Court has wide latitude to issue sanctions in response to Garda's severe discovery violations.

A motion to compel under Rule 37 is appropriate when a party "fails to make a disclosure required by Rule 26(a)," "fails to answer an interrogatory submitted under Rule 33," or "fails to respond that inspection will be permitted – or fails to permit inspection – as requested under Rule 34." Fed R. Civ. P. 37(a)(3)(A), (B)(iii)-(iv). Critical here – according to Rule 37(a)(4), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." *Calkins v. Pacel Corp.*, No. 3:07cv00025, 2008 U.S. Dist. LEXIS 2258, at *6-7 (W.D. Va. Jan. 11, 2008)

Rule 37 governs motions to compel disclosure or discovery and provides that, "[t]he court where the action is pending may, on motion, order sanctions if . . . a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response." Fed. R. Civ. P. 37(d).

Sanctions under Rule 37(d) may include any of the following: (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; and (vi) rendering a default judgment against the disobedient party. Fed. R. Civ. P. 37(d)(3).  However, "[t]he district court may use as many and as varied sanctions as are necessary to hold the scales of justice even." *Progressive Minerals, LLC v. Rashid*, CIV.A. 5:07-CV-108, 2009 WL 2761295, at *7 (N.D.W. Va. Aug. 28, 2009) (quoting 8 Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 2284 at 612–13 (1994).

Courts in this District and Circuit have repeatedly imposed monetary sanctions for violations of discovery rules.  *See, e.g., Mut. Fed. Sav. & Loan Ass'n v*, 872 F.2d 88; *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305 (4th Cir. 2001).   This Court has also imposed sanctions such as striking an answer and dismissal of the case.  *See Alpha Omega Servs. v. Dyncorp Int'l, LLC*, Case No. 1:13-CV-00809, 2014 WL 1401800, at *9 (E.D. Va. Apr. 9, 2014); *Scott v. GMAC Mortgage Serv., LLC*, Civ. 3:10CV24, 2011 U.S. Dist. Lexis 40113 (W.D. Va. April 13, 2011).

The Fourth Circuit has developed a four-part test for determining what sanctions to impose under Rule 37: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998); *accord Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 503–05 (4th Cir. 1977); *S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). In determining the amount of monetary sanctions, courts typically consider the movant's fees and costs associated with the motion to compel discovery compliance as well as any expenses resulting from the prejudice suffered by the movant. *See, e.g., Zaczek*, 764 F. Supp. at 1078; *DirecTV, Inc.*, 2003 WL 24336356, at *3; *Barksdale v. E & M Transp., Inc.*, 3:10CV140, 2010 WL 4534954, at *4 (E.D. Va. Oct. 27, 2010); *Poole ex rel. Elliott*, 192 F.R.D. at 506.

The Court should use its inherent power to impose sanctions "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the [judicial] process." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir.1993); *see also Suntrust Mortg., Inc. v. AIG United Guar. Corp.*, No. 3:09CV529, 2011 WL 1225989, at *13 (E.D. Va. Mar. 29, 2011), *aff'd sub nom. SunTrust Mortg., Inc. v. United Guar. Residential Ins. Co. of N. Carolina*, 508 F. App'x 243 (4th Cir. 2013) ("By now it is well-settled that fraud on the court or abuse of the judicial process warrants use of the inherent power to impose sanctions on the offending party or its counsel, or both.") (citing a collection of cases); *PLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir.1998) (sanctions under court's inherent authority not abuse of discretion when defendant consciously disregards discovery obligations).

The administration of justice relies on parties' voluntary compliance with their obligation to provide discovery.  *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("As soon as the process falters . . . the people are then justified in abandoning support for the system.") (quoting Shaffer, 11 F.3d at 457).  As explained in *Stewart v. VCU Health Sys. Auth.*:

> It is well settled that "[f]ulfilling obligations under the rules requires much more than simply going through the motions. It requires, among other things, a true effort to fully answer interrogatories, to produce relevant documents in a timely manner, and to properly conduct oneself during depositions." *Smith v. U.S. Sprint*, No. 92–2153, 1994 WL 62338, at \*4 (4th Cir. Feb. 28, 1994) (per curiam). **It is equally well established that a litigant's "flagrant bad faith" and "callous disregard" of these responsibilities may warrant "the extreme sanction of dismissal."** ***Nat'l Hockey League v. Metro. Hockey Club, Inc.***, **427 U.S. 639, 643 (1976).**

No. 3:09CV738-HEH, 2012 WL 463561, at \*7 (E.D. Va. Feb. 13, 2012), *aff'd*, 478 F. App'x 757 (4th Cir. 2012) (emphasis added).   "Litigating parties must understand their ethical responsibilities to engage in proper and diligent discovery; lesser attempts . . . inhibit the Court's ability to preside over a fair trial."  *Vir2us, Inc. v. Invincea, Inc.*, 235 F. Supp. 3d 766, 780 (E.D. Va. 2017).

City Walk depends on the honest, diligent participation of Garda in the discovery process.  Yet, Garda made no timely effort to search for responsive documents, and instead exploited such non-disclosure by proffering a key witness who made misrepresentations under oath that were directly contrary to existing, later-produced documents.

## II.  Garda should be sanctioned under Rule 37 and the Amended Complaint should be dismissed due to Garda's numerous discovery violations.

The sanction options contained in Rule 37(b), unlike preclusion, impose penalties "when a party fails to disclose evidence helpful to an opposing party."  *S. States*, 318 F.3d at 592 n.2; accord Fed. R. Civ. P. 37(c) advisory committee note to 1993 amendment ("Preclusion of evidence is not an effective incentive to compel disclosure of information that, being supportive

of the position of the opposing party, might advantageously be concealed by the disclosing party."). If sanctions are not imposed on Garda in this case, it will be incentivized to repeat its abusive discovery tactics and "send the opposite message that the court may be pushed, ignored and defied to the outermost limits so long as the noncomplying party has even an inadequate fallback act ready in the wings should the final curtain be falling." *Mut. Fed. Sav. & Loan Ass'n v. Richards & Associates, Inc.*, 872 F.2d 88, 94 (4th Cir. 1989). For the reasons detailed herein, this Court should grant City Walk's Motion for Sanctions and strike Plaintiff's claims in the Complaint with prejudice.

The Court has inherent authority to impose sanctions for abuse of the litigation process, including but not limited to fraud on the court. *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993); *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, No. 3:09-cv-529, 2011 WL 1225989, at *14 (E.D. Va. Mar. 29, 2011) ("Abuse of the judicial process can take many forms, and the inherent power [to sanction] exists to a full range of litigation abuses."); *Sanford v. Commonwealth of Va.*, 689 F. Supp. 2d 802, 805 (E.D. Va. 2010).

"District courts enjoy broad discretion to select an appropriate remedy in light of the totality of the circumstances." *Thomas v. FTS USA, LLC*, No. 3:13cv825, 2016 WL 3566657, at *10 (E.D. Va. June 24, 2016). While dismissal as a sanction is a severe remedy, a district court has the power to dismiss a party's claims *sua sponte* "in circumstances of bad faith or other like action," *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593 (4th Cir. 2001) (citations omitted), or "when a party deceives [the] court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." *Shaffer*, 11 F.3d at 462; *see also Holmes v. Wal-Mart Stores East, L.P.*, No. 1:10-cv-75, 2011 WL 1842868, at *6 (E.D. Va. Apr. 27, 2011) (striking the plaintiffs' compensatory damages claim for pain and

suffering as a sanction for withholding documents and lying in a deposition); *Brown v. Mortg. Def. Program, LLC*, 2011 U.S. Dist. LEXIS 100918, at \*3-5 (E.D. Mo. Sept. 8, 2011) ("default judgment is the appropriate sanction under the circumstances of this case," where plaintiff failure to comply with Rule 26(a)(1) and properly respond to discovery requests).

As this Court explained in *Holmes*, dismissal can be an appropriate sanction for a litigant's fraud on the court or abuse of the litigation process. In making such a determination, the Court should be guided by the following factors:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Holmes*, 2011 WL 1842868, at \*6 (citing *Shaffer*, 11 F.3d at 462). Here, these considerations strongly point toward dismissal of Garda's claims in Counts III and IV.

Garda has exhibited discovery malfeasance in multiple ways. *First*, Garda failed to identify key individuals with pertinent knowledge of this case in its Fed. R. Civ. P. 26(a) disclosure and interrogatory responses. Despite numerous attempts from City Walk to address Garda's deficiencies, Garda failed to provide any supplemental interrogatory response to disclose pertinent individuals until January 10, 2019, with only two weeks remaining in City Walk's discovery window. Even then, Garda's supplemental disclosure still failed to fully disclose key witnesses, including Steve Morss, who was directly involved in planning the Norfolk relocation/Hampton consolidation. *See* Ex. 12.

*Second*, Garda stated in its Opposition to City Walk's Motion to Compel that "relevant documents with third parties as well as 'internal ruminations about its planned relocation from

Norfolk to Hampton'… ***do not exist***." Pl. Opp. [ECF No. 61] at 6.  However, Garda subsequently produced over 2,000 documents, which included key revelations regarding its internal communications about the Norfolk move and its communications with third parties (such as Garda's clients) notifying them of its plan to move.  These documents are extremely important to City Walk, as they help craft the timeline of when and why Garda decided to move from Norfolk, which strikes at the determinative issues of this case.

*Third*, Garda stated in its initial interrogatory responses on November 1, 2018 and supplemental responses on January 10, 2019 that it never had a plan to consolidate business operations away from Norfolk. *See* Ex. 2 and 3.  As described above, this statement is demonstrably false.  As discovered from Garda's latest document production, the plan to consolidate Garda's Norfolk office to Hampton was part of a collection of office closures, referred to as "Project Whiskey."  *See* Ex. Nos. 14 and 15.  Additionally, numerous presentations created by Garda reflect that the Norfolk move was part of a "Strategic Network Optimization Plan," (*see e.g.*, Ex. 6), and that Garda was notifying clients of its decision to consolidate to Hampton as early as May 17, 2017. *See* Ex. 9 at GARDA 001864.  Despite this, Garda has continually misrepresented that there was "no formal or finalized plan to move the business operations from Norfolk before the constructive eviction." *See* Ex. 2.

One email (produced on January 10, 2019) highlights Garda's misconduct. *See* Ex. 12.  In an email dated March 23, 2017, from Trent Bonnell (former COO) to Steve Morss (Vice President, Transformation Management), and including Justin Uditsky, Bonnell states, "Take Charles with you to Tampa / St. Pete CVS move and train him. **That way he can do Springfield & Norfolk upcoming moves**." *Id.* (emphasis added).  This email is between two Garda executives discussing Garda's planned move from Norfolk and includes Garda's main witness,

Uditsky.  Bonnell was only disclosed in Garda's discovery responses on January 10, 2019, two weeks before City Walk's discovery window closed.  Morss was <u>never</u> identified in any discovery response, and his name does not appear on any document produced by Garda until the January 10, 2019 production.  Further, Uditsky was clearly involved in communications with Bonnell and Morss during the March 2017 timeframe regarding the planned Norfolk closure, yet did not disclose that he had any conversations with <u>anyone</u> prior to August 1, 2017, did not identify Bonnell or Morss as individuals involved in the decision to leave Norfolk, and in fact testified that he alone made such decision, without consulting operations, between August 1 and August 10, 2017. *See* Ex. 1.

Garda's conduct here strikes at the heart of the judicial process and the administration of justice.  "Our adversary system depends on a most jealous safeguarding of truth and candor."  *In re Liotti*, 667 F.3d 419, 429 (4th Cir. 2011) (quoting *Shaffer*, 11 F.3d at 463).  The Fourth Circuit has recognized "the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth."  *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 377 (4th Cir. 2013) (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir.2001)).  Here, Garda has intentionally sought to hide the truth from City Walk and the Court, including by stonewalling City Walk's document collection practices and depositions.

City Walk has been severely prejudiced by Garda's conduct. Garda's failure to identify central witnesses or disclose information relating to "Project Whiskey" has directly harmed City Walk's ability to discover the most crucial facts in this case: when and why Garda decided to consolidate to Hampton.   Due to the late document production, which only came following the Court's Order, City Walk was prevented from issuing additional discovery requests on any of the information gained.  Garda's late identification of Trent Bonnell and outright failure to identify

Steve Morss obstructed City Walk from discovering the key players at Garda who were involved in the decision to leave Norfolk. Misrepresentations made by Uditsky and Garda to both City Walk and the Court was intended to thwart the discovery of the truth and the administration of justice in this case.  Garda's conduct should be firmly sanctioned, and the Court should dismiss the Amended Complaint in its entirety.

**III.   Justin Uditsky should be stricken as a Garda witness based on his untruthful and evasive testimony during his December 6, 2018 deposition.**

   A.   Uditsky's claim that the relocation decision was made between August 1 and 10, 2017 was not credible, as shown documents produced by Garda after his deposition.

In his deposition, Uditsky testified that he, alone, made the decision for Garda to relocate from Norfolk to Hampton, without consulting Garda's operations department, between August 1 and 10, 2017.  Ex. 1 at 176-183.  However, on December 20, 2018. Garda produced numerous documents unequivocally showing that this was not true.  Not only had the decision to move been made well before August 1, 2017, but Uditsky had direct knowledge and involvement of that plan.  *See e.g.* Exhs. 6-9.  Additionally, on January 10, 2019, Garda produced additional documents from March 2017 involving Uditsky and other Garda employees, which reflect that the Norfolk to Hampton project was already underway, and Uditsky was centrally involved with coordinating the move.  *See* Exhs. 11-12.  These documents unequivocally contradict Uditsky's sworn testimony that the decision to move was made solely by him in August 2017.  *See* Ex. 1 at 176-183.

The type of malfeasance in this case is similar to the conduct in *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, where the plaintiff's claim was dismissed due to its repeated discovery abuses, such as providing false answers to interrogatories, false deposition testimony, withholding a large number of relevant documents, and making late disclosures of material

significance. 734 F.3d 366 (4th Cir. 2013).   There, the Fourth Circuit affirmed the District Court's findings that documents directly contradicted the deposition testimony of the plaintiff's key witness, that the plaintiff gave a false answer to an interrogatory when it was asked to "[i]dentify all funds received by [plaintiff] from the [subject account], ... as well as all payments from the [subject account] to satisfy obligations of [the plaintiff]."   *Id.* at 372.   The plaintiff answered that it "has not received funds from [the subject account], and it is not aware of the extent, if any, to which payments were made from [the subject account] in Lebanon to satisfy ... obligations of [the plaintiff]."   The district court found that it was "clear that [the plaintiff] knew that some funds had been paid from the [subject account] to [the plaintiff's] subcontractors."   *Id.*

In her deposition, the plaintiff's witness testified that she was unaware whether payments from the subject account were made to the plaintiff and denied that any benefit was conferred to the plaintiff in connection to the subcontract from payments out of the subject account.   *Id.* at 374–75.   However, the deponent's testimony was directly contradicted by, among other things, an email sent by the deponent which confirmed that had knowledge of payments made from the subject account during the term of the subcontract.   *Id.*   The Fourth Circuit affirmed the District Court's complete dismissal of the plaintiff's case with prejudice.

Here, Uditsky has falsely represented that the decision to relocate from Norfolk to Hampton was made in August 2017, despite emails and other documents clearly reflecting that such decision was made as early as March 12, 2017, and that Uditsky not only had knowledge of the decision but was directly involved in Garda's initial planning to get out of Norfolk.   *See* Exhs. 6-9; 11-12.   Uditsky's testimony reflects a material misrepresentation as to the date and motivation behind Garda's decision to consolidate to Hampton, which are determinative issues this case.   Indeed, they directly contradict Garda's claim that City Walk's renovation efforts in

the Building "forced" them to move out and breach its obligations under the Sublease. Uditsky's misleading statements in his deposition resulted in extreme prejudice to City Walk and severely restricted City Walk's inability to discover key facts in this case. Of course, City Walk could have used this undisclosed, case-dispositive information during its earlier depositions in the case, including that of Uditsky. The sanctions requested in this motion are warranted in light of Garda's egregious conduct.

B.   Uditsky's repeated "I don't recall" responses were evasive and meant to stonewall City Walk's legitimate discovery efforts.

In addition to false statements, Uditsky was purposefully evasive throughout his deposition to prevent City Walk from discovering the truth. Uditsky acknowledged during his deposition that others within Garda were involved in the approval of the relocation from Norfolk to Hampton, yet when asked about the specifics of any communications (including whether any emails were exchanged), Mr. Uditsky would frequently reply, "I don't recall." In fact, throughout his deposition, Mr. Uditsky uttered the phrase (or some variation) "I don't recall" over 140 times. For example:

> Q. So before you sent this E-mail and you started down the route of early termination, did you talk with Joe Della Rocco or not?
>
> A. I don't recall.
>
> Q. Do you recall talking to anyone in Garda's operations before you sent this E-mail about starting the discussions of early termination?
>
> A. No, I don't recall.
>
> Q. Did anyone in operations tell you to start the discussions of early termination at the Norfolk site?
>
> A. I don't recall.
>
> Q. So you don't remember either way?

A. No.

Q. Is there any piece of paper that you've ever seen before March 14, 2017 specific to the Norfolk location talking about early termination of the lease?

A. I don't recall.

Q. You've never seen it?

A. I don't recall.

Q. So you don't recall or you've never seen it?

A. I do not recall ever seeing a piece of paper relating to early termination before March 14th.

Q. Had you ever seen before March 14th, 2017 any piece of paper referring in any way to the moving of the Norfolk location to Hampton?

A. I do not recall.

Q. When you say you don't recall, does that mean you don't recall either way or are you saying there was not any? You're not saying there was not any, you just don't recall seeing it?

A. I don't recall if there was.

Q. And you don't recall if there wasn't?

A. I don't recall.

Q. And how about, before March 14th, 2017 do you recall seeing any piece of paper, E-mail, document, anything, referring to the closure of the Norfolk site of Garda?

A. I don't recall.

Q. Would it be logical that there was communications with operations before you would approach an owner about an early termination of a lease?

A. Absolutely not.

Q. Would it be logical that you would not consult operations before you would go to an owner and say we want to get out?

A. It would be logical, yeah.

Q. So in this instance, though, you don't remember either way whether you had any discussions with operations before March 14th of 2017 about whether the Norfolk location should move or close?

A. I don't recall.

Ex. 1 at. 123-26. By way of further example, when asked about who he communicated with at Garda prior to August 15, 2017, Uditsky stated that he could not recall speaking to anyone other than Eileen Weatherbee, who at the time was the only other individual identified by Garda in its Fed. R. Civ. P. 26 Initial Disclosures:

Q. And before August 15th did you have any discussions with any executive about the Norfolk to Hampton move?

A. I don't recall.

Q. Did -- before August 15th, 2017 did you have any discussions with anyone in the eastern region about the Norfolk to Hampton move?

A. I most likely had a conversation with Eileen Weatherbee about it.

Q. How about someone at the eastern region, not an on site Garda employee but someone at Garda like Joe or someone else?

A. I don't recall. It's possible, but I don't recall.

Q. Who made the decision before August 15th, 2017 that Norfolk was going to move to Hampton?

A. I made the decision.

Q. Without any consultation with operations?

A. Without any consultation with operations.

Q. And so you must have before August 15th, 2017 talked to someone in operations about that decision.

A. I don't recall.

…

Q. So you don't remember whether you talked to anyone else, other than Eileen, before August 15th, 2017 about the move?

A. I don't recall.

…

Q. Do you remember ever sending any E-mails about the decision that you made -- you said you made the decision -- the decision you made to move from Norfolk to Hampton?

A. I don't recall an E-mail, no.

*See* Ex. 1 (Uditsky Dep. at 176-83). As discussed *supra*, Garda's document production revealed numerous emails and communications between Uditsky and other individuals at Garda, including with Trent Bonnell (COO) and Steve Morss (Vice President, Transformation Management) regarding the Norfolk to Hampton move between March and July 2017. *See* Exhs. 7-8; 11-12.

Uditsky had knowledge of the Norfolk to Hampton move in early March 2017 and communicated with numerous employees and executives at Garda regarding that decision. Uditsky's attempt to stonewall City Walk through evasive deposition testimony is improper and sanctionable.

**IV.    City Walk should be awarded its reasonable expenses incurred in making this motion.**

City Walk's request for fees is not only proper but required by Rule 37. Rule 37 clearly states that, when a motion to compel is granted or where discovery is provided after the filing of a motion to compel, "the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion . . . to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A); *see also SunTrust Bank v. Nik*, No. 1:11-cv-343, 2012 WL 1344390, at *3 (E.D. Va. Mar. 22, 2012),

*report and recommendation adopted*, No. 1:11-cv-343, 2012 WL 1344376 (E.D. Va. Apr. 17, 2012); *Rutherford Controls Int'l Corp. v. Alarm Controls Corp.*, 3:08-cv-369, 2009 WL 4015357, at *2 (E.D. Va. Nov. 17, 2009).  Thus, "[a] rebuttable presumption exists in favor of imposing expense shifting sanctions on the party against whom a motion to compel disclosures or discovery is resolved. . . ."  7 Moore's Federal Practice § 37.23.

There are only limited circumstances in which the Court may choose not to award fees under this section (i) if the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) if the opposing party s nondisclosure, response, or objection was substantially justified; or (iii) if other circumstances make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A).  None of these circumstances are present here.

*First*, there can be no credible argument that City Walk did not attempt to meet and confer with the Defendant before filing its motion.  Counsel for City Walk and Garda have discussed Garda's non-disclosure of relocation-related documents and testimony for months.  And, City Walk has filed a motion to compel seeking additional related documents that have been purposefully withheld by Garda.  The parties have not been able to resolve their differences because (a) Garda's discovery violations contradict its fundamental (and now baseless) "constructive eviction" claims in this case, and (b) Garda continues to stonewall City Walk's efforts to obtain key documents from crucial witnesses at Garda (or former employees).

*Second*, Plaintiff's discovery positions were not substantially justified.  In *Bryte v. American Household, Inc.*, 142, Fed. App'x. 699, 703 (4th Cir. 2005), the Fourth Circuit held that the Supreme Court's definition of substantial justification in *Pierce v. Underwood*, 487 U.S. 552, 565, which was a Social Security case, also applies to the term as it is used in Fed. R. Civ. P. 37.  Other circuits had made similar rulings prior to the *Bryte* decision. *See Doe v. Lexington-*

*Fayette Urban County Gov't*, 407 F.3d 755, 765 (6th Cir. 2005); *Pan Am. Grain Mfg. Co., Inc. v. P.R. Ports Auth.*, 295 F.3d 108, 116 (1st Cir. 2002); *Maddow v. Proctor & Gamble Co., Inc.*, 107 F.3d 846, 853 (11th Cir. 1997).  The *Pierce* court found that a party is substantially justified if "there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action."  *Pierce*, 487 U.S. at 565 (internal quotation marks and citations omitted); *see also Rutherford*, 2009 WL 4015357, at *2.  There can be no substantial justification for Mr. Uditsky's untruthfulness and evasiveness during his deposition, including because his representations were directly contradicted by documents produced by Garda *after* his deposition.  Nor can there be any justification for Garda's misrepresentation to City Walk and the Court – to this day – that no formal plans to relocate from Norfolk to Hampton were ever considered by Garda.  Those discovery practices and misrepresentations in sworn discovery responses should not be condoned by this or any court.

City Walk respectfully moves the Court to award it the reasonable expenses incurred in making this motion, including attorneys' fees and costs.

### CONCLUSION

Defendant, City Walk One, LLC, respectfully requests that the Court: (1) grant its Motion for Sanctions; (2) strike and/or dismiss with prejudice Plaintiff's First Amended Complaint in full; (3) exclude Justin Uditsky as a witness on behalf of Plaintiff in this case; (4) award attorneys' fees and costs to City Walk in filing and defending this motion; (5) grant City Walk such further relief that the Court deems appropriate.

Dated: January 23, 2019                               Respectfully submitted,


                                                                  **CITY WALK ONE, LLC**

By_____/s/ *John C. Lynch*_____
John C. Lynch, Esq., VSB No. 39267
Robert W. Angle, Esq. VSB No. 90521
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
john.lynch@troutman.com
woody.angle@troutman.com

H. Scott Kelly, Esq., VSB No. 80546
TROUTMAN SANDERS LLP
1001 Haxall Point, Suite 1500
Richmond, VA 23219
Telephone: (804) 697-2202
Facsimile: (804) 697-1339
scott.kelly@troutman.com

*Counsel for City Walk One, LLC*